May it please the Court, this is a breach of contract case regarding the purchase and sale agreement, the resolution of which principally involves the interpretation of a Texas statute, section 1304.159 of the Texas Occupations Code, or the retail installment contracts that CON entered into with its customers. TF Loan Code contends that CON's representations and warranties in the party's purchase and sale agreement were not true and correct because both the statute and the retail installment contracts required CON to refund to the account debt at issue in this case the prorated purchase price of extended warranty products that were canceled by CON when the consumers defaulted on their accounts. However, the District Court below held that neither the statutes nor the retail installment contracts required CON to make these refunds because the statute and the contracts only apply when a consumer pays for these extended warranty products up front, not when the warranty products are financed by a consumer. And so first I want to address the District Court's holding. What is your bottom line here? Is your bottom line here that your bottom line is not that they should have given money back to the consumer before they charged off and sold you the loan, but that the amount should have been credited against the loan balances that you received, right? That's our bottom line, Your Honor. All right. I thought they agreed to that. That's not my understanding. My understanding is that, well, maybe you should ask them what they agreed to, but my understanding is that there was no dispute that there were approximately 24,000 accounts that they did not make this credit to. What Judge Clark held was that, well, you didn't purchase, the consumers didn't purchase those products up front in cash, they financed them. And so what we did was we stipulated at trial that if we are right about the statute and the contracts, then we purchased those contracts at issue, those 26,000 for approximately $3.3 million. That was our stipulation. And that would be our recovery if also Section 9.4, which is our sole and exclusive remedy, says that we get our money back, they get the contracts back. There was a second stipulation that, okay, if the contracts, or excuse me, if the contracts at issue did not require Kahn to pay us back our money, this is Section 9.4, and rather there was another remedy, which would be this adjustment, then our damages would be approximately $300,000. Well, so I didn't see anything in your briefing that directly addressed the consequences of 2.7 adjustment. Yes, ma'am. And partially because that issue was not raised in Judge Clark's findings of facts and conclusions of law, but it was raised, obviously, in the party's brief, and I'll address it in two regards. Well, I'm telling you, I saw them raise it, I didn't see you address it, and you're the appellant. Well, of course, you don't want that remedy, so I guess that's... And our argument is twofold on that. First and foremost is we have a provision in the PSA that says what our sole and exclusive remedy is, and that's Section 9.4. Now even if it was not our sole and exclusive remedy, our position is, well, we can elect whatever remedy we want. But even beyond that, Section 2.7 just simply doesn't apply to this case. And the reason is that 2.7 applies in two instances. First is when payments have been made by or on behalf of an obligor received by cons on or prior to the cutoff date, but that did not make it into the reflected account balances. Well, what the cutoff date was was a moment in time a few weeks before the closing date. So that's if the purchaser made a payment? Correct. Okay. What's the other one? Before closing. Right. The other one was as of the cutoff date, the parties said, or cons said, okay, this is the account balance, but subsequently a check or other form of payment made by a consumer would have been dishonored leading up to closing. And so those are the only two situations where 2.7 applies, and it just simply doesn't apply in this context and in this case. Again, we say that the benefit of our bargain was to purchase accounts that complied with cons representations and warranties, and if the accounts did not comply, then we would just give them back, we'd get our money back. And the promise compliance, again, goes back to the first question you were asked, not that money gets paid back that the customer had never paid, but that the accounts are and to look at them, they reflect that reduction. Right. And if cons would have made that reduction on the front end, we would have paid less for the accounts than what we actually did. And the problem is now that we have accounts that don't have accurate and correct balances and we didn't bargain for the ability to have to go in and clean those up ourselves. That's why you refused most of them. Correct. That's why we didn't close on the second tranche. You didn't want to litigate that with each customer. Correct. Well, but each customer would not have had a right under Texas law to sue for that, correct? My guess is they would have had a right insofar as when cons places these accounts in collection, so I'm taking a hypothetical of cons is going to go sue a consumer for failure to pay. And most of these are going to be in justice court because they're small claims. That's fine. Just get to the point. Absolutely. The consumer can show up in court and say, hold on, Judge, yes, I owe some money, but I owe less because cons canceled my warranty product when I first defaulted. And now there's this pro rata portion of that warranty product that cons is not honoring that I shouldn't have to pay for or a judgment shouldn't be entered against me for. But that doesn't trigger 1304, does it? That's just the defense they'd urge, or is that a 1304, is that a 1304 case law? Do you see my point? There's no implied action under 1304, right? Yeah. I would think a consumer would have a direct action because the language of 1304.159 says that a consumer is entitled to a refund. But that's really beside the point because it really doesn't matter what the consumer has. All that matters is what our contract has. So you claim that your contract, the contract promised you more than the consumers would have. The contract provided us that we would get clean accounts with correct account balances. Let's say we have those accounts. Now the state, if they're right that there's not a private cause of action under section .159, we're still holding those accounts. We're still holding the bag. What do you do with cons' argument that under the consumer finance contract, which was not the same as the service agreement, under the consumer finance contract they specifically said they are not obliged to refund those amounts? Your Honor, I respectfully submit that the district court in cons, they cited the correct sentence but they didn't go on to cite the very next sentence in the contract. And in the very next sentence, so what they cited was in the event of an insurance policy or repair service agreement cancellation, no refund of any amounts paid by purchaser for any such policy or agreement will be due to purchaser. Rather, here's the next sentence, refunds will be applied to the balance of the defaulted account. That language is consistent with our reading of the statute and what we talked about. So you agree with the first sentence, no refund of money is paid. No refund of money is paid, correct. Let me ask you a question. Before you would go out and try to collect on these accounts, you would have to do some verification independently under the Fair Debt Collection Practices Act, right? Well, we would have to send out validation notices. Right. That gives the consumers 30 to 60, we're well aware of that. Yes. All right. And so you send out your validation, have you sent out any validation notices? I do not know if we have, Your Honor. Well, if you had sent out the validation notices. Second validation. And whatever, and the consumer came back and said, wait a minute, I bought a five-year service agreement and I defaulted after one year, then you'd have to respond to that, right? That's correct. And why doesn't a principal, I mean, so, you know, there could be errors in any account the cons gave you for any reason, right? There could certainly be errors for any reason, but this one particular reason is a big one. Why is it big? How many of these people are getting service agreements? Service agreements, you know, most people say are not worth the money they're written with, but. 26,000 accounts out of the 54 that we purchased had them, Your Honor. But that doesn't mean they're all in default, does it? The reason that cons placed those or sold us those accounts was because they were in default. I understand that, but that doesn't mean that all of the service agreements are in default. No, because cons canceled the service agreements upon default, so they went away. And they had the right to cancel them. How many had credit due? How many of the consumers had credit due on the service accounts? There were 26,418 total accounts. And we used a hypothetical in our brief about someone buying a TV and then buying a three-year service warranty and financing it all. And then we just kept it easy and said, assume the consumer never once paid a single dime to cons. But in reality, and this is why we really came together at trial and came up with our damage stipulation, because there were a lot of accounts where consumers had paid money on the account, but then at some point defaulted. Cons canceled the RSA, the Repair Service Agreement, and then put that account into default or charge-off status under their policies. And so what we would say, to interpret the statute, we would say that the court ought to say that the species of the underlying transaction, whether a consumer pays for an extended warranty product in cash or credit, begets the species of the resulting refund. Can you address the windfall circumstance? Their argument is a windfall for the customer. I think you're suggesting it's actually a windfall for con credit. Yes, it is, Your Honor. How do you look at the windfall? In fact, I would direct the court to cons' brief on page 6 and 7. And they explain it very, very well. They specifically say that they are made whole when they cancel the extended warranties, because cons sells warranties to the consumers, but the warranties are administered by a company called Assurant. So every time cons cancels a warranty, it goes back to Assurant and gets the full refund, yet they're still trying to collect that unused, unearned portion from the consumers. They're not properly crediting the account. So that ends up being a huge windfall to con if they're successful in collecting an account that makes it in the charge book. Does the record reflect that they did try to collect, ever? I do not believe the record reflects—well, I don't know if the record reflects that, but there's no doubt that when they— If they did collect, then the account balance that you were given would have been an accurate one. But it would be the same one they would have been using to collect, assuming you're not in the picture. I don't believe there's evidence that they collected on accounts after they put the accounts in default and canceled the RSAs. If there were no Texas Statute 1304.159, would you still have an argument? Yes, we would, Your Honor, because of the contracts. And specifically tying the consumer retail installment contracts into Section 8.3 of the PSA, which is a representation and warranty that con's performance under the agreement would not breach their obligations under these other contracts. Well, what I don't understand is the logical implication of your statement about this warranty breach is that if con's had mistakenly—made a mistake in these accounts, let's say with regard to the interest at the time or something like that, of $10, your sole and exclusive remedy would be to break the whole contract and make them pay you. It's just returning the account and then giving it back. Am I correct? Yes. So, what you're saying is that you have no—if all you're relying on is the contract, you have no—you're claiming it's total, you know, no question of materiality of the breach of warranty whatsoever. And what's your best Texas case for that? On the issue of— Breach of the warranty. Breach of the warranty. If it's inconsequential. Our best Texas case for that. I mean, whether for good or ill, the district court did find that if it was a straight breach of warranty, it had to be material, right? Right, Your Honor. Our best Texas cases, I believe, on that issue are—we cite them in our brief. I think it's Myriad, and those—the point is this. Solar applications? Solar applications. That relates, Your Honor, to—are we talking about grafting the materiality inquiry into the condition preceding? Yes. Nope. I'm talking breach of warranty. Breach of—Your Honor, a breach is a breach. And whether a breach is material— I just find that hard to believe, that $1 or $2 would make it an express breach of warranty. Your Honor, whether a breach is material or not only relates to whether it excuses a party from performance. If a breach is deemed immaterial, the party can still sue for damages. They just have to perform their obligations under the contract. What's your best—and I ask again, what's your best Texas case on that? Tell me. I thought your argument was premised on these being conditions preceding. Well, they were, Your Honor. We don't—in fact, we waived our argument at trial that we were relying on a prior material breach defense to excuse our performance. But I think what Judge Jones is asking is, put aside your affirmative defense. You're looking just directly at the elements of a breach of contract case in Texas. And, Your Honor, in our brief— Well, I don't want to waste your time. I don't want to waste the Court's time either. My apologies. Why don't you just—that's okay. Why don't you just take it up on your vote? Thank you, Your Honor. Okay. That's fine. Okay. Mr. Pitard. In the police court, Your Honors, Kirk Pitter and Thad Hartfield on behalf of ConCredit. I'd like to, first of all, address some of the questions that were posed by the Court with regard to certain things. For instance, with regard to the materiality issue concerning the breach of contract, we have case law from the Texas Supreme Court, the Hernandez case, that sets forth five factors to be considered to determine whether a breach of contract is material. And even as—even to the extent materiality concerns conditions precedent, we have case law not only from this Court in the South Texas Electric Co-op case from 2009, but also from the Texarkana Court of Appeals in the Sammons case, Fourth Court of Appeals in the Lessicar case, where with regard to conditions preceding the courts have said that excuse of non-performance of conditions precedent, if it's not an essential part of the contract, the Court considers also whether there is a—it operates as a forfeiture. And conditions precedent under Texas law are not favored, and when they're—particularly when there's an extreme forfeiture, if the conditions precedent were applied. And in this situation, if there was—and we would argue there was not a breach of the condition precedent or a breach of the contract itself. But to the extent there is a materiality analysis, which we think is not only required under Texas law but is also required under the purchase and sale agreement, when we look at whether there was an extreme forfeiture on behalf of the alleged breaching party, there would be a complete forfeiture. Because as Judge Jones, as you noted, what they have sought is a cancellation of the entire portfolio of accounts, which is 53,000 accounts, a big account. And they're looking for an entire forfeiture of the entire contract as opposed to the remedy that's provided under the purchase and sale agreement under 2.7, which is, look, when you have a—when you have a mass transaction like this, numerous accounts, there's just no doubt that certain accounts are going to slip through despite everyone's due diligence. I have to agree with them that the way—I mean, I've got a copy of Section 2.7 here because I don't think you ever quote it in your brief. And it does seem to have just two conditions. And one is if the consumer had made a payment before closing. And the other one is if the consumer tried to make a payment before closing, but it was a stop payment. It was, you know, NSF or something. And those seem to be the only basis for making an adjustment. Well, I believe 2.7 will apply when there has been payment on behalf of the consumer, which in this case, CONS made that payment for the repair service agreement on behalf of the consumer. What payment did CONS make on behalf of the consumer? CONS pays for the entire repair service agreement. When a customer comes in— You're talking about the Assurant? Yes, yes, CONS pays Assurant. That's like getting reinsurance or whatever. But they said, and I think maybe you said too, that Assurant somehow—it doesn't make any economic sense to me, but somehow Assurant refunds money to you if you have a charge back on the consumer if you have to cancel that contract. That's correct. And that's because CONS— So how do you ever lose from refinancing the warranty provision? Well, so when we pay the entire cost of the repair service agreement to Assurant, and then at the point of charge-off, because there is still an amount of time left on the service contract, Assurant pays us back for the amount of the service contract that has been stopped, that has been canceled. If we were then, if CONS was then required to repay the consumer for an amount that they never paid, then the consumer would be getting reimbursed for something that they never paid for, and then there would be a windfall to the consumer. But they are not arguing for that, a repayment. What they're saying is you can't get from Assurant and then turn around and separately collect again, and yet the debt package you offered them would allow that double recovery. I understand. And the point with regard to—and this kind of gets into the fact where I was talking about how when you have a transaction this big, there are certain—there's no doubt there's going to be certain accounts that slip through that have some deficiencies. And in this particular case, if there's a deficiency, such as there has been an amount sold to TF Loan Co. that they can collect on that we could not collect on, the amount, the unearned amount on that RSA, that repair service agreement, then that gets us to two issues. One is in selling that account to TF Loan Co., is that a material breach? Okay. Back to the materiality. Yes. But I guess let me ask the same question that was first asked of opposing counsel. Did you or didn't you adjust the total amount down, reduced by amounts that hadn't been paid? Did you agree to credit the accounts? We agree with who? Did you agree—did it happen to the consumer? Did their accounts get credited? Those accounts did not get credited, and that amount was sold to TF Loan Co., and that will then get us into the second issue, which is what the remedy is if there is a material breach. And the remedy being, instead of a complete forfeiture of this entire transaction, we go to 2.7, which we would argue allows for an adjustment of those accounts, because certain accounts are going to slip through that have some deficiencies. And so if we can go to 2.7 and adjust those accounts, then TF Loan Co. still has this entire portfolio of accounts that they can collect on, and the adjustments have been made pursuant to the purchase and sale agreement, so the accounts that they're collecting on are then the appropriate amounts that they can collect on. So you're— Are you saying that in the instances when the account was not credited with the unexpired service agreement amount, that was a slip-up, or was that something that you did routinely? It was something that was routinely done, but when the information—when this transaction begins and there is a confidential memorandum that's signed between the parties, once that's signed, CONS provides in what's called a data room. It's an electronic place where they can then go—CONS can go and review all the materials related to these accounts. And TF Loan. TF Loan Co. I'm sorry, I made a mistake there. So when they get the materials related to these accounts, they can see from those accounts how certain things are treated. They can see how the RSAs are treated. They can see how finance charges are treated. And they've got all the material to determine—to see how CONS has treated these unexpired RSAs with regard to these accounts. But when the statute requires you to balance the account, accommodate the account for the amount that's expired, why does TF Loan have to go do it themselves? Well, the statute actually—and I think the trial judge was correct on this—the statute deals with when there has been a purchase for the entire RSA. So, for instance, in a transaction where a consumer buys a consumer product and they have it under a retail installment contract and they're paying installments for that, at the beginning of that contract, they can either purchase up front the entire amount of the RSA or they can finance that RSA. And so what the trial judge in this case concluded was that if the consumer hasn't paid for the entire RSA, then there's nothing to refund back to them at the time of charge-off. And that's the point we're getting at, is that the statute doesn't apply in this case because it only deals when the consumer has paid for the entire RSA up front. Purchase is not a purchase unless it's a cash transaction. Well, you have installment purchases. So to the extent that the consumer has made installment payments throughout the contract, then yes, they've purchased and even had the benefit of that RSA as they've paid those installments. But at the time of charge-off, there's no more RSA, there's no more contract, and they still have the consumer good. But yeah, at that point, there's no more RSA to refund. But you're collecting on your account, which says, as their hypothetical shows, $300 for the RSA, even though it was canceled after one year at $100. Well, Judge Jones, actually, CONS does not collect on those accounts after charge-off. And that was one of the questions that was asked. Well, now wait. That would be a significant—no, that can't be right. Because you're saying CONS does not collect. That's correct. Okay, fine. But you sold accounts to them that looked as if there was an amount owing on the service agreements, even though those have been canceled. That's correct. And that's why, when we get to the analysis regarding if this was a material breach, which there's still a question—we still have an argument that it was a material breach—then what is the remedy? Do we cancel the entire transaction, or do we adjust the account? I mean, suppose you're wrong about the statute only applying to a cash purchase of an RSA. Is it not correct, in any event, that there is no private right of action that flows from that, that the statute is something that the state attorney general can enforce against a seller? That's correct. There's not a private right of action by a consumer under that act. Okay. So, the only right of action they ought to be able to pursue here is for a breach of the PSA. That's correct. Okay. And if a material breach was found under the PSA, then we would argue that under 2.7, they can adjust accounts and everybody move forward with them having correct balances on all the accounts moving forward, and they can collect on those. I understand the— Yes. You did focus quite a bit on the idea that the RIC governs over the RSAs for charge-off, and you said the RIC does not require a refund of the unearned amount, right? That's correct. But are they correct that the following sentence says that we will apply the unearned amount to the default balance? Well, there was a question that was asked of my opposing counsel a while ago, and it was, are you all asking for a buyback? I mean, are you asking for a refund of an amount, or are you asking for an adjustment of the account? Right. And throughout their briefing, they were pushing for a repayment to the consumer. That's what I thought. I was very confused, and I thought the trial court was confused about that, too. Well, that was my understanding, too, and that's how we briefed it the way we did. And so that's why we argued that there's no requirement for a refund for amounts that haven't already been paid. And then in their reply brief, they said, no, no, we're talking about a credit to the balance, too. And in making that argument in their reply brief, I think that they're mixing two different concepts which are distinct and important. And one reason they're distinct and important is because if adjustments to accounts are appropriate, that can be handled under 2.7, and everybody's fine moving forward with this trend of action. Doesn't that just cover mistakes, erroneous calculations? Well, when you're dealing with a transaction this size, inevitably there are going to be accounts that slip through, not only that may need adjustment to accounts, but there may be accounts that slip through that are actually completely unenforceable. I don't see how these slip through if this is what you do in the regular course of your business. Well, and that's a good point. It's not uncommon in the industry, particularly when you're dealing with 50,000. I'm sorry? Some of these are lower income people. You're going to come across somebody who's a minor. Occasionally, you're going to come across people who are, you know, where the product was no good. You know, they're just... Well, in the... It can't be totally scrubbed clean when you sell them. That's right. And that's why in this due diligence process at the beginning of this transaction, CONS provides TF Loan Co. with all this data and information. And while they're reviewing all this data and information, they have an opportunity to contact CONS and say, wait a minute, we've got a question about how this is handled, or we have a question about this or that. Throughout the entire negotiations, TF Loan Co. never once contacted CONS to ask about this RSA refund or this RSA account issue. They never contacted them about that. The first time the RSA issue was raised was in a December 14 email to CONS, and this is after the lawsuit has already been filed. What law? Their lawsuit? This lawsuit had already been filed. And in fact, in August of 2014, TF Loan Co. sends a letter to CONS that says, we're not going forward with this agreement, and here's why. And they lay forth various different complaints that they have, none of which mention the RSA issue. So they didn't even raise the RSA issue before this lawsuit was filed. It was only raised after this lawsuit was filed in a December email. But the discord said no one found the contract here ambiguous. So their position is that they assumed those accounts had been credited according to their RIC and the RSA. Why would they ask any questions? They just assumed that. It was the representation that they could rely on. The representations that were made in the PSA are that these are materially accurate, and that's where the materiality issue comes in. Are they materially accurate, or is there some small portion that needs adjustment? If there's some small portion that needs adjustment, then the representation is not a material misrepresentation. Okay. In these numbers, I thought they're saying this is 26,000, and it was your practice as to every single defaulted one that you financed. This wasn't a slip-through. This was the practice of yours. Yeah. What I'm saying is, with regard to each one of the accounts, it's a small amount with regard to each account. Now, when you look at the accounts as a whole, yes, there were 53,000, and actually the entire PSA would have covered close to 70-something thousand accounts. They could have resolved this. You could have resolved this without a lawsuit if they had said, hey, what's going on here? And you said, oops, we screwed up. You need to adjust your collection letters, right? That's exactly right. Under the PSA, under 2.7, we could have adjusted the accounts. Well, I mean, as a gentleman, you could have adjusted the accounts. Correct. But 2.7, we keep coming back to that. If that is only where the seller failed to credit payments from the customer, how does 2.7 help at all? Unless it's this theory that you did pay for the customer by paying assurance? We did. That's how 2.7 works here? That's correct. And then also, Deborah Everly, who was an expert testifying in this case, she discussed how 2.7 is more appropriate for a remedy in this case as opposed to the buyback remedy and explained that the buyback remedy is most appropriate when an account is unenforceable. Go ahead. For instance, when that account has been discharged in bankruptcy, can't collect on it at all, or that account is the person is deceased, or that account was procured by fraud. When they're unenforceable, that's when the buyback remedy kicks in. That's the appropriate time for the buyback remedy to kick in. Who wrote this contract? I don't know who wrote it. I do know the parties who participated in the negotiation of the PSA. There were people on both sides. I've got their specific— I mean, it's a tailor-made contract. It's not some kind of form. Oh, it's not a form. Now, I don't want to represent to the court, for instance, that this is not similar to other debt sales that Collins has with other purchasers. I don't know that for sure. Right. And, again, if this is a contract deal and this involves a condition precedent, then you've cited your best cases to us for the reason that that applies to materiality. Yes, Your Honor. Materiality has to be part of that calculus. Yes, Your Honor. We cited the Hernandez case from the Texas Supreme Court. Well, that's an insurance case, and they say that insurance cases don't govern in this area. Do you remember their citation to the case Baird Family Partnership? Is that—do you have that as a— Baird Family Partnership. I do recall that there was a discussion about whether a case dealing with an insurance contract actually applied in this particular contract. I believe the trial judge cited the Prodigy case, which was an insurance contract, which the trial judge recognized. But then the trial judge also, in his findings and facts and conclusions of the law, cited this Court's opinion in Quorum Health, where the Court stated that applying Texas law, insurance contracts are subject to the same rules of construction generally applicable to contracts. Oh, well, let me just ask you one other question. If the stipulated amount here for the value of the difference in the value of the contract is $3 million, how can that not be material? Well, when you're dealing with a contract that was—I mean, the accounts, the whole value of the accounts was $99 million. Now, I realize— That's the face value, and they purchased them for $6 or $7 million. That's correct. They purchased them for about roughly 7% of the face value. Right. And so— So if you divide $3 million into $26 million, that's about, at best, $9 per account. I wouldn't— Because they said there were, I'm sorry, 26,000 accounts. Okay. I don't question the Court's math. No, I'll bet you don't. It's even worse than that because they said this discrepancy affected or error affected 26,000 accounts, and if you divide—I think the proper deal is $3 million. I'll figure it out. I like him. I'll figure it out. Is there no further questions, Your Honor? Thank you. Thank you. Appreciate it. Your Honor, sorry for fumbling around on the case side. It was the Myriad case, Judge Higginson. It's Myriad v. Altec, 817 Federal 2nd, 946 out of the Western District of Texas. There's also a Texas Supreme Court case, Levine v. Steve Scharn Custom Homes, 448 Southwest 3rd, 637. Those cases are in your brief. They're on page 40 and 41 of our brief, Your Honor. To clarify, we're not seeking to forfeit the entire portfolio. We're only seeking to get a payment back and the accounts back on just 26,000 out of the 54,000 accounts. Well, I mean you're also seeking to not have to close on the other two tranches, right? That as well. So that's—what do you call it? In contract law, you're breaking the whole contract basically. Well, we still own another 26,000 accounts that we're not seeking. Yeah, I understand. We're collecting those. The other thing, Your Honor, we did argue in our brief that CONS should have made credit refunds. It's never been our position ever that CONS has to pay consumers cash. You could have fooled me. I read this very carefully, and I—you know, it wasn't until your reply brief that it said, well, of course they can give them an offset to the debt owed. And quite frankly, the specific interpretation issue that we're dealing with, CONS never even raised in the trial court. This was all sui sponte by the district court came up with this theory. Which theory? The theory that the contracts, the retail contracts, and the Texas Service Contract Regulatory Act only apply when a consumer pays up front in cash, and therefore only cash refunds can be made because consumers have paid for the warranty product in cash. And that was the first time we'd ever heard of that theory. And so we were trying to address that in our brief to say, look, a refund is a refund, whether it's a cash refund or a credit refund. When I checked in my hotel this weekend—or yesterday, the clerk told me— No, but you knew that when the district court issued his order, so you could have made that distinction from the very outset. But anyway, so you say there's—the stipulated damages are around $3 million, and there are about 20-some thousand accounts. So I think that's about—and what was the average value of the account? All 54,000 accounts had a value of $100 million. We purchased those accounts for approximately six to seven cents on the dollar. Well, I understand that, but, okay, on face value, that would be about $2,000 per account, something like that. It averaged out that way, yes, ma'am. Okay. The other issue I briefly wanted to address was this idea that T.F. Lonecoe failed during due diligence to identify the RSA issue. And our position is, as a matter of law, that a party is not required to do due diligence on an express warranty and representation made in a contract. We are entitled to rely on that representation and warranty, especially when there is a concomitant section in the purchase and sale agreement that talks about what happens if those representations and warranties are not true. Well, you obviously didn't think much about these accounts since all you're willing to pay is six or seven percent. So you've already factored in an extraordinarily—a very significant— it may be commercially reasonable, but it's a very significant discount because you know you're not going to get back all you expected, right? Your Honors, thank you, unless you have any other questions. Good for you, giving back time. Thank you very much. It's a very interesting case. Okay.